# United States Court of Appeals
## For the First Circuit

No. 10-1318

UNITED STATES OF AMERICA,

Appellee,

v.

CRUZ ROBERTO RAMOS-GONZÁLEZ, a/k/a Robert Belleza,
a/k/a Belleza, a/k/a El Galán, a/k/a Crucito,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lipez, Siler[*] and Howard,
Circuit Judges.

Linda Backiel for appellant.
Dina Avila-Jimenez, Assistant United States Attorney with whom
Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-
Sosa, Assistant United States Attorney, Chief, Appellate Division
and Luke Cass, Assistant United States Attorney, United States
Attorney's Office, were on brief, for appellee.

December 9, 2011

_____

[*]Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Defendant-appellant Cruz Roberto Ramos-González ("Ramos") appeals his conviction for possession with intent to distribute in excess of 500 grams of cocaine.  See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B).  Among other claims of error, Ramos contends that his Sixth Amendment right to confrontation was violated when the district court allowed a forensic chemist to testify regarding the results of a drug analysis that he did not conduct.  Recent Confrontation Clause jurisprudence compels us to agree.  For the reasons set forth below, we vacate the conviction and remand for a new trial consistent with this decision.

## I. Background

In July 2002, while on routine traffic patrol in Caguas, Puerto Rico, Transit Police Officers Wanda Vélez-Mojica ("Vélez") and Javier Reyes-Flores ("Reyes") attempted to stop a pickup truck with unlawfully tinted windows.  The driver refused to yield, and a chase ensued.  Although the officers were able to forcibly stop the vehicle, the driver fled on foot and managed to elude capture.  Upon closer inspection of the abandoned truck's interior, Vélez identified two plastic-wrapped blocks of a substance that she believed to be drugs, and the blocks were taken to the Puerto Rico Transit Police Station in Caguas ("Caguas station") for analysis.

At the Caguas station, an agent from the Drug and Narcotics Division, Juan Santana Rodriguez, conducted a field test of the blocks.  Neither Vélez nor Reyes participated in the field

test, and there is no evidence that it was observed by any other officer. The two blocks were subsequently transferred to the Puerto Rico Forensic Science Institute ("the Institute"), where they purportedly tested positive for cocaine.

The Institute chemist who analyzed the seized substance, José Borrero, was initially listed as a prosecution witness; however, due to mental illness and related treatment, he was unavailable to testify regarding his analysis. Thus, three days before the trial commenced, the government amended its witness list to substitute Kelvin Morales-Colón ("Morales"), another chemist at the Institute, for Borrero. Despite the substitution, the witness description remained unchanged, identifying Morales as an expert who would testify "[b]ased on his specialized training and experience in the examination and analysis of controlled substances . . . including the methodology used to examine the [drugs seized from the pickup], and the conclusions reached based on his expertise and examination of the substances."

At trial, neither Vélez nor Reyes testified definitively as to the contents of the blocks. Vélez, who was at the Caguas station but not in the room when the blocks were analyzed, stated that she "believe[d]" they tested positive for cocaine. Reyes's only testimony that the seized blocks were cocaine was his 2002 statement memorializing the incident, which he read into the record. In the statement, he reported that Rodriguez had performed

-3-

a field test on the evidence which yielded a positive result for cocaine. Reyes did not testify, however, that he was present when the field test was performed, and Rodriguez himself did not testify at trial.

The government then called Morales, as its expert witness, to testify regarding the composition of the seized substance. After outlining the Institute's intake and chain of custody procedures, Morales began to discuss the results of Borrero's test. Defense counsel objected on the basis that Morales had no personal knowledge of the underlying analysis, but the trial court determined that, based on Morales's experience and familiarity with official procedure[1], he should be allowed to testify as to the veracity of this particular test. Morales in fact had no involvement in testing the seized substance, and was no longer working in Borrero's department when the testing occurred.

Morales confirmed that the evidence envelope entered by the government bore the signature of his colleague José Borrero, which he recognized from their years of working together. Based on the envelope's unique number, Morales explained that the analyzed substance was that which had been seized by Reyes and delivered to the Institute by Rodriguez, and that it was evidence in a matter

---

[1]At the time of his testimony, Morales had been employed as a chemist with the Institute for eight years. He worked for six years in the controlled substances division and in 2007 moved to forensic chemistry.

involving Ramos. He verified that the information on the evidence envelope matched the results reported in Borrero's certificate of analysis, and when questioned about those results, provided the following testimony:

> PROSECUTOR: Do you know the results of -- I'm sorry. Looking at the envelope here, can you say what are the results of this test that was conducted?
>
> MORALES: Both bricks were positive for cocaine, and had a combined weight of 2,116 grams, including its wrapping in the plastic.

No further evidence was introduced at trial to prove that the blocks seized from the truck contained cocaine.

Ramos was ultimately convicted by a jury and sentenced to 327 months in prison. This timely appeal ensued.

## II. Analysis

### A. Standard of Review

We first address the appropriate standard of review for the Sixth Amendment claim. The government argues that because Ramos did not specifically invoke the Sixth Amendment in his objection, he failed to preserve a cognizable Confrontation Clause challenge. See United States v. Mercado, 412 F.3d 243, 247 (1st Cir. 2005) ("[A]n objection on one ground does not preserve appellate review of a different ground."). Accordingly, the government contends that the district court's ruling should be reviewed for plain error. See United States v. Ziskind, 491 F.3d 10, 14 (1st Cir. 2007). We disagree. Defense counsel alerted both

-5-

the court and the government to the basis of his objection, asserting:

> I originally thought [Morales] was the chemist who conducted the analysis of these controlled substances, but I believe [he is] not. It was Mr. Borrero. So <u>I object to the fact that he has no personal knowledge of the test being conducted</u>.

(emphasis added). In context, it was clear that counsel was objecting to the inability to confront the declarant. <u>See</u> <u>United States</u> v. <u>Cabrera-Rivera</u>, 583 F.3d 26, 36 (1st Cir. 2009). His precise language, which may best be understood as a "short-hand reference to an objection on confrontation grounds," sufficiently raised the Sixth Amendment issue, and we therefore review the challenge de novo. <u>Id.</u> If Ramos's Sixth Amendment rights have been violated, his conviction must be vacated unless the government demonstrates that the error was harmless beyond a reasonable doubt. <u>See</u> <u>id.</u> (citing <u>United States</u> v. <u>Earle</u>, 488 F.3d 537, 545 (1st Cir. 2007)).

## B. Confrontation Clause Challenge

Ramos contends that Morales's testimony regarding the substance of Borrero's report was barred by the Sixth Amendment, as construed in <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004), and <u>Melendez-Diaz</u> v. <u>Massachusetts</u>, 129 S. Ct. 2527 (2009). Given the evolving foundation upon which this claim rests, we first review briefly the current state of the Supreme Court's Confrontation Clause jurisprudence.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend. VI.  In Crawford, which effected a shift in Confrontation Clause doctrine, the Supreme Court established a new constitutional baseline: admitting "testimonial" statements[2] of a witness not present at trial comports with the Sixth Amendment "only where the declarant is unavailable, and . . . the defendant has had a prior opportunity to cross-examine [the declarant]."  541 U.S. at 59.  Subsequently, in Melendez-Diaz, the Court held that certificates of analysis, like the report prepared by Borrero here, are appropriately classified as testimonial statements for purposes of the Sixth Amendment.  129 S. Ct. at 2532.  Thus, the admission of such a report, for the truth of its contents, necessitates accompanying live testimony by a competent witness.  Id.

In a decision which post-dates the argument in this case, the Court further clarified in Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011), that where a certified forensic lab report is introduced as substantive evidence, the surrogate testimony of "a scientist who did not sign the certification or perform or observe

---

[2]A statement ranks as "testimonial" where it has a "primary purpose of establishing or proving past events potentially relevant to later criminal prosecution."  Bullcoming v. New Mexico, 131 S. Ct. 2705, 2714 n.6 (2011) (internal quotation marks omitted); see also Nardi v. Pepe, ___ F.3d ___, 2011 WL 5840286, at *4 (1st Cir. 2011).

the test reported in the certification" does not satisfy the accused's right to confrontation. Id. at 2710. Thus, where a testimonial certified forensic lab report is offered for its truth as evidence in a criminal prosecution, the accused has at least the right to confront the scientist who performed, observed, or supervised the analysis.

These Supreme Court cases are instructive, but they do not squarely address an issue that must be explored in this case: the extent to which the Sixth Amendment permits an expert witness to disclose the substance of a previously unadmitted forensic lab report that he did not draft. See Bullcoming, 131 S. Ct. at 2722 (Sotomayor, J., concurring) ("We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the . . . statements were not themselves admitted as evidence."). Indeed, the Court has granted certiorari in People v. Williams, 238 Ill.2d 125, 939 N.E.2d 268 (Ill. 2010), cert. granted, 131 S. Ct. 3090 (U.S. June 28, 2011) (No. 10-8505), to consider a version of this question. See id. (considering whether the disclosure of the substance of a forensic lab report, through an expert witness who took no part in the analysis, violates the Confrontation Clause). It is within this developing framework that we examine the case at bar.

The government argues primarily that, unlike in Melendez-Diaz, Morales's testimony constituted permissible expert review of Borrero's report, which was itself never actually offered as evidence. See Fed. R. Evid. 703 (explaining that facts or data of a type upon which experts in the field would reasonably rely in forming an opinion need not be admissible in order for the expert's opinion based on the facts and data to be admitted). Absent further clarification from the Court, the reconciliation of Crawford, Melendez-Diaz, and Bullcoming -- which forbid the introduction of testimonial hearsay as evidence in itself -- with Rule 703, which permits expert reliance on otherwise inadmissible testimonial hearsay, will necessarily involve a case-by-case assessment as to the quality and quantity of the expert's reliance. See United States v. McGhee, 627 F.3d 454, 460 (1st Cir. 2010).

More specifically, the assessment is one of degree. Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal. See United States v. De La Cruz, 514 F.3d 121, 134 (1st Cir. 2008) (holding that the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon); see also Bullcoming, 131 S. Ct. at 2722 (Sotomayor, J., concurring) ("[T]his is not a case in which an expert witness was asked for his

independent opinion about underlying testimonial reports that were not themselves admitted into evidence."). Where an expert acts merely as a well-credentialed conduit for testimonial hearsay, however, the cases hold that her testimony violates a criminal defendant's right to confrontation. See, e.g., United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010) ("[Where] the expert is, in essence, . . . merely acting as a transmitter for testimonial hearsay," there is likely a Crawford violation); United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009) (same); United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. 2007) ("[T]he admission of [the expert's] testimony was error . . . if he communicated out-of-court testimonial statements . . . directly to the jury in the guise of an expert opinion."). In this case, we need not wade too deeply into the thicket, because the testimony at issue here does not reside in the middle ground.

The government is hard-pressed to paint Morales's testimony as anything other than a recitation of Borrero's report. On direct examination, the prosecutor asked Morales to "say what are the results of the test," and he did exactly that, responding "[b]oth bricks were positive for cocaine." This colloquy leaves little room for interpretation. Morales was never asked, and consequently he did not provide, his independent expert opinion as

to the nature of the substance in question.[3]  Instead, he simply parroted the conclusion of Borrero's report.  Morales's testimony amounted to no more than the prohibited transmission of testimonial hearsay.  While the interplay between the use of expert testimony and the Confrontation Clause will undoubtedly require further explication, the government cannot meet its Sixth Amendment obligations by relying on Rule 703 in the manner that it was employed here.

As an alternative basis for admissibility, the government points to language from Melendez-Diaz to argue that "it is not the case[] that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person . . . ."  129 S. Ct. at 2532 n.1.  This argument misses the mark.  Ramos does not contest the prosecution's use of Morales to establish the chain of custody or the authenticity of the sample; rather, he challenges the use of Morales to channel Borrero's testimonial statement that the substance was cocaine.  Although Morales was intimately familiar with the Institute's policies and procedures, knew Borrero personally, and was likely confident in the accuracy of the test results, the "obvious reliability of a testimonial statement does not dispense with the Confrontation Clause."  Bullcoming, 131 S.

_____

[3]The government acknowledged at oral argument that Morales was never asked to give his independent opinion as to the nature of the substance.

-11-

Ct. at 2715 (internal quotation omitted).  The Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed . . . in the crucible of cross-examination."  Crawford, 541 U.S. at 61.

Reciting the conclusion of Borrero's report into the record raised a host of concerns, to which Morales was ill-equipped to reply.  For example, defense counsel could not effectively query Morales about whether any circumstance or condition affected the integrity of the sample or the validity of the analysis, and what test and testing process Borrero employed.  See Bullcoming, 131 S. Ct. at 2714-15.  Nor could defense counsel, through Morales, "expose any lapses or lies on [Borrero's] part."  Id.  Perhaps more significantly, as in Bullcoming, Morales knew relatively little of the severity of Borrero's mental illness, or the extent to which it may have affected the quality of his work.  See id.  Such issues were grist for cross-examination; the failure to provide Ramos with that opportunity thus violated his right of confrontation.

### C.  Harmlessness of the Error

The government argues that any Sixth Amendment error was harmless beyond a reasonable doubt.  See Cabrera-Rivera, 583 F.3d at 36 (citing Earle, 488 F.3d at 545).  In evaluating harmlessness, we consider several factors, including whether the challenged statements were central to the prosecution's case; whether the statements were merely cumulative of other, properly admitted

evidence; the strength of corroborating or contradicting evidence; the extent to which cross-examination was permitted; and the overall strength of the case. Earle, 488 F.3d at 546.

The harmlessness determination in this case depends principally on whether the information disclosed by Morales was merely cumulative of the testimony offered by Officers Reyes and Vélez. In so arguing, the government asserts that "[a]n officer is permitted to express his opinion that a field tested substance is cocaine," see United States v. Paiva, 892 F.2d 148, 160 (1st Cir. 1989), and that scientific analysis and expert testimony are not necessary to prove the illicit nature of a substance, United States v. Valencia-Lucena, 925 F.2d 506, 512 (1st Cir. 1991). Such testimony has been deemed adequate to establish the composition of an allegedly controlled substance, however, only where the witness was found to be reliable because of her unique familiarity with the drugs in question.

For example, in Valencia-Lucena, we held that the "[i]dentification of a substance as a drug may be based upon the opinion of a knowledgeable lay person," where that lay person was a confidential informant who was formerly one of the drug-traffickers, and who had both intimate knowledge of the alleged conspiracy to distribute and prior direct contact with the drugs. 925 F.2d at 512. Similarly, in Paiva, we found that the district court did not abuse its discretion in permitting testimony by a

-13-

long-term drug addict that the substance she had seen and tasted was cocaine. 892 F.2d at 160-62.

By contrast, the indicia of reliability here were far less substantial. Neither Vélez nor Reyes testified as to the nature of the substance based on their experience or intimate knowledge. The sum of their testimony consisted of Vélez's statement that the blocks "appeared to be a controlled substance," and the officers' recollections that Rodriguez's preliminary field test -- for which they were not present -- showed the presence of cocaine. This is not the type of specially reliable lay testimony that was proffered in Valencia-Lucena or Paiva, and it does not meet the stringent requirement of proof beyond a reasonable doubt.

Further, to the extent that the government argues that there was additional corroborating evidence, that evidence does not go to the central issue. The fact that several law enforcement agents identified Ramos as the truck's operator, and the presence inside the truck of various identifiers bearing Ramos's name, go to the question of whether Ramos was in fact the driver of the truck, and not whether, as Morales concluded, the substance in the truck was cocaine.

Accordingly, Morales's testimony was neither cumulative of nor sufficiently corroborated by alternative evidence, and it comprised the only compelling basis for the jury to conclude a critical element of the government's case - that the substance

-14-

seized from the truck was cocaine.  We cannot conclude that the presence of cocaine would have been proved without the testimony of Morales, and therefore the admission of his testimony was not harmless beyond a reasonable doubt.

### III. Conclusion

Although Ramos presses additional claims of error, we need go no further.  For the reasons set forth above, we vacate the judgment of conviction and remand to the trial court for further proceedings.  **It is so ordered**.