# United States Court of Appeals
# For the First Circuit

No. 12-1780

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS LIRIANO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

William T. Murphy, with whom William T. Murphy Law Offices, Inc. was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

August 4, 2014

**HOWARD, <u>Circuit Judge</u>.** Appellant Dennis Liriano was convicted of conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846. After denying Liriano's post-trial motions, the district court sentenced him to eighty-four months of incarceration. Liriano argues on appeal that the evidence at trial was legally insufficient to support the conviction and that various trial errors, either individually or cumulatively, warrant reversal of his conviction. We reject each of Liriano's appellate advances and affirm his conviction.

## I.  BACKGROUND FACTS

In evaluating Liriano's claim that the evidence was insufficient to support his conviction, we recount the facts in the light most favorable to the verdict. <u>United States</u> v. <u>Davis</u>, 717 F.3d 28, 29-30 (1st Cir. 2013).[1] We first outline the basic facts of conviction, adding more details as they become relevant to particular arguments.

On the night of June 17, 2009, United States Border Patrol Agents Christopher Orsetti and Nicholas Francescutti were patrolling in a marked vehicle near the Canadian border in Ellenburg, New York, when they received a call to be on the lookout for an orange Ford Focus with New York license plates. Ellenburg is roughly 45 miles east of the Akwesasne Indian Reservation, which

---

[1] Our factual recitation borrows from the district court's Opinion and Order denying Liriano's post-trial motions for acquittal and a new trial. <u>United States</u> v. <u>Liriano</u>, Cr. No. 09-100-S, 2011 WL 4435650 (D.R.I. Sept. 22, 2011).

straddles the border between New York and Canada. The Reservation, which cannot be patrolled by federal agents, is known to authorities as a popular location for smuggling illegal aliens and myriad types of contraband, ranging from tobacco to drugs and weapons.

At approximately 10:30 p.m., the agents spotted the wanted car, which was being driven erratically and at a high rate of speed. They stopped the car, and after noting the smell of marijuana, conducted a search and found two duffel bags with approximately fifty pounds of marijuana in each. They also found a smaller bag containing approximately 40,000 pills (roughly twenty-seven pounds) of Benzylpiperazine (BZP), a schedule I controlled drug.[2] The agents arrested the driver, Xavier Robert. The agents also found a fuel receipt from a convenience store located within the Akwesasne reservation that was time-stamped earlier that evening.

Robert was recruited to assist in the agents' investigation of what appeared to be a drug deal. After he agreed to conduct a controlled delivery, Robert was taken to a motel room that he had rented days earlier in nearby Plattsburgh, New York, where he waited with the agents to receive instructions. The next morning, Robert participated in a series of phone conversations

---

[2] According to the United States Drug Enforcement Administration, BZP is a stimulant with no known medical uses in the United States. See U.S. Dept. of Justice, Drug Enforcement Administration, Office of Diversion Control, Drug & Chemical Evaluation Section, July 2012, available at http://www.deadiversion.usdoj.gov/drug_chem_info/bzp/bzp.pdf

with two French-speaking men.  He was eventually instructed to deliver the smaller bag -- the one containing the 40,000 BZP tablets -- to Rhode Island.  Instructions in hand, the agents and Robert left the hotel and flew to Rhode Island.

Upon arrival in Rhode Island, Robert received a text message instructing him to contact a Rhode Island telephone number. He did so, asking for "Henry," as he was also instructed to do. The person who answered the call (later identified as Liriano) however, told Robert that he had dialed a wrong number.  After confirming with his contacts that he had, in fact, dialed correctly, Robert prepared to call again. Before he did so, however, Agent Robert Charles instructed Robert to tell "Henry" that he (Robert) "has a package of candy for you."  Robert called again and asked, "Are you supposed to see a guy today?  To get some candy?"  Liriano responded, "Ah! Okay, okay, okay, okay."

Robert and Liriano subsequently arranged to meet at 266 Adelaide Avenue in Providence.  Robert informed his Canadian contact, who responded approvingly and told Robert to text him when the deal was done.  At the urging of the agents, Robert made additional calls to both the Canadian contacts and Liriano, eventually changing the location of the meeting to a pharmacy parking lot in Providence.

When the two men met, Liriano expressed concern about surveillance cameras in the parking lot, passers-by watching them, and the New York license plates on the car that Robert was driving. He then tried to convince Robert to accompany him to his house,

whereupon agents moved in and arrested both men.  In Liriano's wallet they found one business card for a motel on the Akwesasne reservation and another for an auto body shop in Montreal.  His cell phone number was the same one that Robert had called three times and that had called Robert three times within the relevant time period.

Liriano and Robert were both charged for their roles in the thwarted deal.  Robert pled guilty, but during what would turn out to be Liriano's first trial, he refused to testify despite a grant of immunity.  The court found Robert in contempt, and the trial ended with a hung jury.  The government did not call Robert to testify in the second trial, which lasted two days and ended with Liriano's conviction.  This appeal followed the court's denial of Liriano's post-trial motions for judgment of acquittal and new trial.

## II.  ANALYSIS

A.  Sufficiency of the Evidence

We review Liriano's sufficiency claim de novo.  United States v. Rios-Ortiz, 708 F.3d 310, 315 (1st Cir. 2013). "[R]eversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt."  Id. (quoting United States v. Symonevich, 688 F.3d 12, 23 (1st Cir. 2012)).  We need not conclude "that no verdict other than a guilty verdict could sensibly be reached," but must only be satisfied that the verdict finds support

in a "plausible rendition of the record." <u>United States</u> v. <u>Hatch</u>, 434 F.3d 1, 4 (1st Cir. 2006) (citations omitted).

To sustain a drug conspiracy conviction, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying offense and that the defendant elected to join the agreement, intending that the underlying offense be committed. <u>United States</u> v. <u>Paret-Ruiz</u>, 567 F.3d 1, 5 (1st Cir. 2009). An agreement to join a conspiracy "may be express or tacit . . . and may be proved by direct or circumstantial evidence." <u>United States</u> v. <u>Rivera Calderón</u>, 578 F.3d 78, 88 (1st Cir. 2009). Finally, "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." <u>United States</u> v. <u>Cortés-Cabán</u>, 691 F.3d 1, 14 (1st Cir. 2012), (quoting <u>United States</u> v. <u>Martínez-Medina</u>, 279 F.3d 105, 113 (1st Cir. 2002)), <u>cert. denied sub nom</u> <u>Domínguez-Colón</u> v. <u>United States</u>, 133 S. Ct. 2765 (2013)).

Liriano argues that the evidence was sufficient to show only that he attempted to receive some undefined substance, not that he agreed to attempt to receive a controlled substance.[3] More specifically, he argues that the evidence only shows that he was

_____

[3] Liriano obliquely alludes to an argument that the government was required to prove his specific knowledge that the controlled substance at issue was BZP. Even assuming the argument is sufficiently fleshed out to be properly before us, it is contrary to our precedent. <u>See</u> <u>United States</u> v. <u>Burgos</u>, 703 F.3d 1, 10 (1st Cir. 2012) ("[T]he Government must show that the defendant knew the conspiracy involved a controlled substance, but need not show that the defendant knew the <u>specific</u> controlled substance being distributed."(emphasis in original)).

-6-

familiar with a motel near the Akwesasne Reservation and a body shop in Montreal, and that he met with Robert. A full and fair view of the evidence, however, reveals much more.

There is no dispute that Robert was operating with instructions to deliver BZP to Providence and that Liriano answered the phone associated with the number provided to Robert. Also, Liriano twice referred to "other people" in his conversations with Robert -- in connection with his expectation of a call prior to Robert's and whether those "others" had given Robert his address. The jury could have concluded that he was referring to Robert's associates. Additionally, the jury could have found that the Canadian contact's positive response indicated familiarity with the meeting address that Robert reported, suggesting that there had been previous contact with Liriano. Moreover, Liriano actually appeared at the parking lot to meet with Robert, further evidence that he was participating in the scheme. And he questioned the parking lot's suitability, raising another inference that he was aware of the illegal activity. Finally, Liriano's enthusiastic reaction to Robert's use of the word "candy" -- suggested as a euphemism for or description of the BZP pills[4] -- supported a finding that he was a willing participant in the deal. Stripped to its essence Liriano's argument is that the jury could only have found that his response to Robert's calls was no more than a coincidence because he was awaiting delivery of some other

_____

    [4] A jury could reasonably find from the photograph of the BZP pills, which was an exhibit at trial, that the pills resembled little candies.

-7-

material.  The evidence is more than sufficient for the jury to have reasonably concluded otherwise.

B.  Confrontation Clause

Liriano argues that two statements introduced to the jury violated his Confrontation Clause rights.  The jury heard an audio recording of Agent Charles instructing Robert to use the word "candy" during his second call to Liriano, and of Robert subsequently using the term when speaking to Liriano.  The inability to cross-examine Robert and Charles (neither of whom testified), Liriano claims, violated his confrontation rights in that it prevented him from exploring the meaning of the term "candy" with either of them.  Finding that the argument was preserved, we review the claim de novo.  United States v. Rivera-Rodríguez, 617 F.3d 581, 590 (1st Cir. 2010), cert. denied, 133 S. Ct. 1306 (2013).

The Confrontation Clause of the Sixth Amendment generally prohibits the admission of testimonial hearsay against a criminal defendant.  See Crawford v. Washington, 541 U.S. 36, 68 (2004). Under Crawford, a declarant's testimonial out-of-court statement cannot be admitted consistent with the Confrontation Clause unless: 1) the declarant testifies; 2) the defendant had a prior opportunity for cross-examination; or 3) the statement is admitted for purposes other than for the truth of the matter asserted. United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009).  In order to cut to the chase, we assume without deciding that Robert's and Charles's statements above were "testimonial."  See United

-8-

States v. Phoeun Lang, 672 F.3d 17, 22 (1st Cir. 2012) (observing that Crawford issue includes analysis of whether out-of-court statements were "testimonial"), cert. denied, 133 S. Ct. 2730 (2012).

Here, the question posed by Robert to Liriano -- "Are you supposed to see a guy today? To get some candy?" -- falls within the third Crawford exception in that it provided context for Liriano's response. Indeed, this case is identical in all relevant respects to United States v. Santiago, 566 F.3d 65 (1st Cir. 2009), in which we found no error in the admission of recordings of two government informants talking with the defendant about an upcoming drug transaction. Id. at 69. ("[T]he statements of the informants were not offered for their truth but as exchanges with Santiago essential to understand the context of Santiago's own recorded statements arranging to 'cook' and supply the crack."); see also United States v. Walter, 434 F.3d 30, 33-34 (1st Cir. 2006) (affirming admissibility of informant's end of a conversation with defendant as providing context for statements by defendant that constituted admissions under Fed. R. Evid. 801(d)(2)(A)). Accordingly, there was no error in admitting this statement.[5]

Agent Charles's instruction to Robert takes us in a

---

[5] We also note that although Liriano was permitted a standing objection to many putative hearsay statements, he never sought a limiting instruction with respect to Robert's "candy" comment. See United States v. Mubayyid, 658 F.3d 35, 72 (1st Cir. 2011), cert. denied, 132 S. Ct. 2378 (2012); see also United States v. Maher, 454 F.3d 13, 23 (1st Cir. 2006) (finding no plain error where district court gave a limiting instruction following improper admission of testimony).

slightly different direction. Although the district court's pretrial orders called for the defendant to propose any redactions to any recordings that the government intended to introduce, Liriano did not do so. Such a failure constituted a waiver. See United States v. Cianci, 378 F.3d 71, 104-05 (1st Cir. 2004) (noting with approval district court's use of pretrial order requiring defendant to propose redactions to evidentiary tapes and finding that district court's waiver ruling was within its discretion). Notwithstanding Liriano's failure to request a redaction, and even assuming that Agent Charles's instruction to Robert was improperly before the jury, any error in admitting it was in any event harmless beyond a reasonable doubt. See United States v. Cabrera-Rivera, 583 F.3d 26, 36 (1st Cir. 2009) (noting that where evidence is admitted in violation of the Confrontation Clause, we may affirm a conviction if the government demonstrates that the error was harmless beyond a reasonable doubt). The record shows that any error in admitting Charles's comment likely redounded to Liriano's benefit: during closing argument defense counsel, in an attempt to undermine the government's case, exploited the fact that Robert needed Charles's prompting. Moreover, as we explained in rejecting Liriano's sufficiency claim, the overall strength of the government's case establishes that any error was harmless beyond a reasonable doubt. See id. (listing factors to consider in harmlessness evaluation).[6]

---

[6] We decline to adopt the government's assertion that defense counsel's closing argument constituted a waiver as a tactical decision. See United States v. Washington, 434 F.3d 7, 11 (1st

C.  Closing Argument[7]

        Liriano alleges that certain comments made by the prosecutor during rebuttal constituted misconduct that warranted a new trial.  Some stage-setting is in order.  In closing, the prosecutor said:

> "I am the guy you are supposed to see today.  I am the guy with the candy.  Okay.  Okay.  Okay."  Your jobs as jurors in this case is to determine whether or not there's sufficient evidence to establish that this Defendant, Dennis Liriano, knew that "candy" meant illegal drugs.

The defense closing contained the following passage:

> You've got the transcripts.  You listen to the tape.  And [in] that second telephone call Xavier Robert says, "You want some candy?" I'm paraphrasing it.  I'll stand by what the transcript says.  But if you look at the call immediately before that, you will see at the very end, . . . that the word "candy" is introduced into this case by an agent.  It's not something Xavier Robert came up with.  It's blood in the water for a shark.  It's bait.  That's what Dennis Liriano . . . jumped at.

_____

Cir. 2006).  Although there is a dispute as to the precise contours of the objection, defense counsel did object to the audio tape's admission, and only tried to take advantage of the comment in closing, after the statement had been admitted.  We similarly reject Liriano's attempt to liken this case to United States v. Meises, 645 F.3d 5 (1st Cir. 2011).  There, the in-court witness testified in such a way that "a reasonable jury could only have understood [the witness] to have communicated that [the declarant] had identified appellants as participants in the drug deal."  Id. at 21; see also Maher, 454 F.3d at 23 (cautioning against use of "context" basis in a case where non-testifying informant identified defendant as a drug dealer).  Robert's statement, standing alone, carried no such inflammatory message.

[7]  The parties tussle over whether these arguments were preserved.  It is of no moment, because they fail under any standard of review.

Defense counsel also argued:

> If these pills were in a zipped up bag-and I
> interject that your memory controls this. I
> don't think there's any direct evidence in
> this case that the bag was even in the trunk
> of that Ford Focus. There was a lot of talk
> of how they went out and rented a Ford Focus
> and flew everybody down here, but I don't
> recall either Special Agent Holloran or
> Special Agent O'Neill, former Special Agent
> O'Neill[,] testifying that the bag was
> actually in the trunk of that car. But your
> memory controls that. By comparison, it's a
> small point.

Next, the prosecutor began his rebuttal with:

> [Defense counsel] has one of the greatest
> reputations in the state as a criminal defense
> attorney. He is a veteran litigator and a man
> that many of us who practice law here in Rhode
> Island look up to. He would never
> intentionally mislead you in any way, shape or
> form as to what the state of the evidence is
> or what issues you need to focus on.
>
> Sometimes in our enthusiasm as advocates, we
> kind of miss the ball and we get ahead of
> ourselves. In this particular case, with the
> crime that's been charged here, the crime of
> conspiracy, and please take a look at the
> instructions again if there's any question in
> your mind as to what the elements of that
> offense are, it's absolutely totally
> irrelevant as to whether or not there were
> even drugs in the trunk of the car.
> . . . .
> Now, the evidence does show, I would suggest
> to you, and you may recall this testimony,
> that the agents dumped out the BZP into some
> other containers and they went out and they
> purchased over-the-counter drugs about the
> same size and color, you might recall that, as
> the BZP. They threw some random samplings of
> the BZP in the bag and the bag went in the
> trunk of the car. You'll recall that
> testimony.

Finally, the prosecutor further argued:

[Defense counsel] says, you don't know what the candy is. You don't know what the candy is. Candy could be gray market goods. . . . No. Folks, 'candy' was a code word. [Defense counsel] says, Look at the transcript. The agent introduced the word 'candy.'

Of course I also, please, encourage you, look at that portion of the transcript where the agent says, Tell him you've got candy. These are veteran customs agents who have conducted countless numbers of drug investigations. Isn't it reasonable to infer from the evidence that they know what the buzz words are in the drug trade? Of course it is. It's only reasonable to conclude this is a phrase used in the drug trade. And it certainly hooked this Defendant, didn't it? 'I'm the guy with the candy. Okay. Okay. Okay.'

Liriano argues that the prosecutor's statement that "candy" was a code word introduced to the jury a fact not in evidence. While the prosecutor indeed asked the jury to make that inference, he did not state that there was evidence proving the meaning of the "code word."[8] His conduct therefore was not improper. See United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005) (observing that a prosecutor may, during closing argument, attempt to persuade the jury to draw inferences from the evidence, but may not rely on knowledge or evidence unavailable to the jury). Given Liriano's response to the word used by an individual ready to deliver a bag of pills, the inference was a permissible one.

Liriano also argues that the reference to "veteran Customs Agents" constituted improper introduction of evidence because Agent Charles, who provided the "candy" instruction to

---

[8] The district court expressly excluded a statement from Robert to an agent that "candy" was a code word for an illegal drug.

-13-

Robert, did not testify and there thus was no evidence of his experience. Charles's partner, however, testified at length about his own experience and his partnership with Charles.[9] While the jury may have understood the prosecutor's remarks to refer to both agents, the allegation of reversible misconduct falls short of the mark. In assessing a misconduct claim, we analyze 1) whether the conduct was isolated; 2) the presence of any curative instructions; and 3) the likelihood of prejudice affecting the outcome of the case. United States v. Gentles, 619 F.3d 75, 81-82 (1st Cir. 2010). Here, there was no misconduct. And in any event, the comments were isolated and necessarily of limited effect, the jury was instructed that the attorneys' arguments were not evidence, and the remainder of the evidence, along with the trial court's instruction, ameliorated any potential prejudice. We therefore find no abuse of discretion in the district court's denial of a new trial.

Finally, Liriano argues that the prosecutor's praise of defense counsel, immediately followed by the claim that counsel misstated the evidence, amounted to an improper attack on defense counsel. First, there is no dispute that defense counsel did misstate the evidence with respect to whether a bag of pills was in the car. Second, in addition to correcting the misstatement, the prosecutor also argued that whether there were pills in the car was

_____

[9]    In concluding that the government's statement about "veteran customs agents" improperly introduced new evidence, the dissent erroneously ignores the testimony of Agent Charles's partner, a veteran customs agent.

-14-

irrelevant, thus lessening the already slim chance that the jury would interpret the comments as a credibility attack. Finally, we again observe that any risk to the defendant was further ameliorated by the jury instruction that arguments are not evidence. On this issue, as well, there was no abuse of discretion in the denial of a new trial.

D. The Business Card

Liriano makes a brief argument that the Montreal body shop business card found in Liriano's wallet should have been excluded as irrelevant.[10] Liriano's argument is that the card was "simply a piece of paper" with no independent connection to the conspiracy. Relevant evidence, however, does not need to resolve a key issue in the case, but "only move the inquiry forward to some degree." Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010). "A relevancy based argument is usually a tough sell." Id. Here, given the facts that the other participants in the conspiracy were Canadian and that Liriano's wallet also contained a link to the Akwesasne Reservation, the business card was relevant.

### III. CONCLUSION

The conviction is **affirmed.**


**- Dissenting Opinion Follows -**

---

[10] Liriano does not argue that any probative value was outweighed by unfair prejudice, pursuant to Fed. R. Evid. 403.

-15-

**TORRUELLA, <u>Circuit Judge</u> (Dissenting).** In the trial of Dennis Liriano ("Liriano"), the government bore the burden of proving beyond a reasonable doubt that Liriano conspired to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. A critical fact in the case was thus whether Liriano knew that Xavier Robert's reference to "candy" actually referred to a controlled substance and not to some other form of contraband. Puzzlingly, however, the government chose not to elicit any testimony about the meaning of the term "candy," or about code words or street names used to describe either controlled substances generally or BZP pills specifically. Then, in closing argument, the prosecutor urged the jury to infer the meaning of "candy" based on evidence not presented at trial. Finding the prosecutor's statements at closing argument to be both improper and prejudicial in this case, I believe a new trial is required and I respectfully dissent.

The primary question before the jury, as the prosecutor stated at the beginning of his closing argument, was "whether or not there[] [was] sufficient evidence to establish that this Defendant, Dennis Liriano, knew that 'candy' meant illegal drugs." The theory of the defense was that "candy" could have referred to any manner of contraband, and without evidence that Liriano knew "candy" meant drugs, there was insufficient evidence to convict. Throughout the trial, Liriano's counsel repeatedly elicited testimony from government witnesses that all manner of contraband is smuggled into the United States via the Akwesasne Indian

-16-

Reservation, including weapons, counterfeit prescription drugs, counterfeit Rolex watches, and counterfeit credit cards.

In closing argument, the prosecutor first properly argued that it was reasonable to conclude that "candy" did not refer to chocolate. He added that common sense suggested that a phone conversation about a drug deal would likely be "cryptic" and "coded." The prosecutor then expanded this line of argument in rebuttal, telling the jury:

> [Defense counsel] says, you don't know what the candy is. You don't know what the candy is. Candy could be gray market goods. . . . No. Folks, "candy" was a code word. [Defense counsel] says, Look at the transcript. The agent introduced the word "candy."
>
> Of course I also, please, encourage you, look at that portion of the transcript where the agent says, Tell him you've got candy. These are veteran customs agents who have conducted countless numbers of drug investigations. Isn't it reasonable to infer from the evidence that they know what the buzz words are in the drug trade? Of course it is. It's only reasonable to conclude this is a phrase used in the drug trade.

Defense counsel took issue with these statements. The government had not previously offered any evidence about the experience of the agent who introduced the word "candy." The jury had heard nothing regarding the agents' familiarity with "buzz words" in the drug trade or their understanding of the meaning of "candy." Accordingly, defense counsel moved for a mistrial on the grounds that these statements introduced new evidence unsupported by the record.

Faced with these facts, the majority appears to miss the thrust of Liriano's argument by looking at fragments of the prosecutor's remarks in isolation. As the majority asserts, a comment that "candy" is a code word, considered alone, may indeed be unobjectionable. However, once the prosecutor's statements are considered together and in context, it becomes clear that the prosecutor asked the jury to infer that the agent who introduced the word "candy" did so because he was a veteran agent who knew from his extensive investigative experience that "candy" was a buzz word used in the drug trade. Given that the government introduced no evidence to support such an inference and instead relied upon information not contained in the record, these statements were improper.[11]

"It is well settled that in its closing argument the prosecution may not rely on knowledge or evidence unavailable to the jury." United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999)

---

[11] The majority suggests that we erroneously ignore the testimony of Agent Charles's partner, who, the majority asserts, testified "at length about his own experience and his partnership with Charles." This assertion is misleading. First, Agent Charles's partner neither introduced the term "candy" nor testified as to its meaning, so his discussion of his own experience does not help to shed light on the experience -- or lack thereof -- of Agent Charles. Second, although Agent Quackenbush arguably discussed his own experience "at length," the same cannot be said of his testimony regarding his partnership with Agent Charles. The sum total of his testimony about their partnership consisted of Agent Quackenbush calling Agent Charles "my partner." He discussed neither the length of their partnership nor any other information that could shed light on Agent Charles's experience as an agent. Accordingly, the prosecutor's suggestion that Agent Charles's understanding of drug code words could be trusted because he was a veteran agent who had conducted "countless numbers of drug investigations" was totally devoid of record support.

(internal quotations omitted). While a "prosecutor may attempt to persuade the jury to draw inferences from the evidence," United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005) (internal quotations omitted), these comments may cross the line into misconduct where they "rely on too big an inferential leap." Hamie, 165 F.3d at 84 (citing United States v. Artus, 591 F.2d 526, 528 (9th Cir. 1979) (finding the prosecutor's statements in closing argument improper because they referenced the authority of Director of Federal Bureau of Prisons when the Director's powers had not been placed in evidence)); see also United States v. Vargas, 583 F.2d 380, 385 (7th Cir. 1978) ("At some point . . . the inference asked to be drawn will be unreasonable enough that the suggestion of it cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper instructions and to the rules of evidence.").

In this case, the prosecutor relied on knowledge and evidence not available to the jury to support the "inferences" he presented in closing argument. Neither Agent Charles nor Robert ever testified at trial. No evidence of Agent Charles's experience as a customs agent or his rationale for instructing Robert to say "candy" was ever presented to the jury.[12] Additionally, while the

---

[12] In Liriano's first trial, the court expressly excluded testimony that the reason Agent Charles suggested the term "candy" was because Robert had told him that was how Robert referred to the drugs.

government elicited testimony from several agents as to the nature and appearance of BZP and amounts inconsistent with personal use, at no point did any witness discuss the use of any code names for drugs generally, or BZP specifically.[13]  From this void, the prosecutor asked the jury to infer that the experience of an agent, about which they had no evidence, allowed that agent to deduce that "candy" was a "buzz word" used in the drug trade, a topic on which they heard no testimony.  Considered together and in context, it becomes clear that, with these statements, the prosecutor improperly introduced new evidence to the jury in closing argument.

Finding that the prosecutor's statements were improper and thus constituted misconduct does not end the analysis, however. "A new trial is unwarranted so long as we are able to conclude with a high degree of confidence that the alleged prosecutorial misconduct did not affect the outcome of the trial." United States v. Smith, 982 F.2d 681, 684 (1st Cir. 1993).  The likelihood that prejudice stemming from the improper comments affected the outcome of trial is considered in light of the following factors:  "(1) the severity of the prosecutor[]'s misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct

---

[13]  When reviewing the sufficiency of the evidence, the majority observes that terms "candy" was "suggested as a euphemism for or description of the BZP pills."  Certainly, the prosecutor "suggested" in closing argument that "candy" was "a code word" used in the drug trade, but it is of critical importance that no evidence was introduced on the subject.  And although the majority hypothesizes that the jury might have determined that "candy" meant BZP pills because the pills physically resemble candies, not even the prosecutor suggested that the "candy" designation was suggested or used because of the physical appearance of the pills.

occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants." United States v. Castro-Davis, 612 F.3d 53, 66 (1st Cir. 2010) (quoting United States v. Nelson-Rodríquez, 319 F.3d 12, 38 (1st Cir. 2003)).

It is clear that the improper statements in Liriano's trial were confined to a few sentences in the prosecutor's rebuttal, and they did not permeate the trial. Additionally, while the court gave only a general jury instruction that arguments were not evidence, as opposed to a specific curative instruction targeting and striking the improper statements, defense counsel did not request any such curative instruction.

However, the context in which the statements were delivered points towards the likelihood of prejudice. As we have repeatedly recognized, "prejudicial statements made during closing argument militate in favor of reversal because they are the last words spoken to the jury by the trial attorneys." United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007) (internal quotation marks and citation omitted).

Further, and in my view most significantly, the court must consider the strength of the evidence against Liriano. As we have previously observed, "[t]he strength of the case against the defendant often is the most significant factor to be balanced against the prosecutorial misconduct." Smith, 982 F.2d at 684-86 (finding that a new trial was not warranted after the prosecutor's improper statements because the evidence against the defendant was

-21-

uncontested); see also United States v. Gentles, 619 F.3d 75, 82 (1st Cir. 2010) (finding no prejudice from improper remarks "because this is not a close case and there is no likelihood that the remarks could have affected its outcome" where there was an "abundance of independent evidence" (internal quotation marks and citation omitted)).

In this case, unlike Smith and Gentles, the evidence of Liriano's guilt was neither uncontested nor abundant. Rather, "this was a close case and the prosecutor's misstatements went to the heart of [the] defense." Azubike, 504 F.3d at 40 (finding prosecutor's statements prejudiced defendant where "there was no direct evidence that [the defendant] knew what was in the package, and the government was required to prove [the defendant's] knowledge through inference"). In fact, the district court itself observed that Liriano's was a "close case." The strongest evidence that Liriano was conspiring to possess with intent to distribute a controlled substance included recorded conversations that implied Liriano was in communication with Robert's handlers, as well as Liriano's reaction to the word "candy." I consider each in turn.

In a recorded conversation, Liriano told Robert that "[t]here are two people who called me at this number. I didn't know. They never called me first." In a second call, Liriano asked Robert, "[d]idn't they give you my address?" The majority argues that "they" could have referred to Robert's handlers, which could support an inference that Liriano was in communication with the conspirators. In addition, Robert spoke with his handlers to

verify Liriano's number and address, which the majority interprets as supporting an inference that the conspirators were familiar with Liriano. Such indirect and circumstantial evidence is hardly overwhelming. Cf. United States v. Doe, 860 F.2d 488, 495 (1st Cir. 1988) (finding no prejudice after improper comments where "[t]he evidence against them on the possession charge was simply too overwhelming").

The majority also credits Liriano's presence at the meeting with Robert and his reaction to the word "candy" as evidence supporting a finding that Liriano possessed the requisite knowledge and intent. However, both facts are equally consistent with a finding that Liriano was hoping to acquire an illegal good other than a controlled substance, like the weapons and other contraband known to be smuggled via the reservation.

Given the weak circumstantial evidence that Liriano knew Robert was bringing him drugs as opposed to another form of contraband, the prosecutor's argument that the agents knew from experience that "candy" was code in the drug trade was of critical importance and went directly to the heart of the defense. Thus, I am unable to conclude with a high degree of confidence that the prosecutorial misconduct at issue did not affect the outcome of the trial. Accordingly, I would find that the district court abused its discretion when it denied Liriano's motion for a new trial.